UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 08-11959-GAO

FATIMA BUTLER,
Plaintiff,

v.

MICHAEL ASTRUE, Commissioner of Social Security Administration,
Defendant.

OPINION AND ORDER
March 29, 2010

O'TOOLE, D.J.

The plaintiff, Fatima Butler, appeals the denial of her application for Social Security Disability Insurance ("SSDI") benefits by the Commissioner of the Social Security Administration ("Commissioner"). Butler applied for SSDI benefits on September 12, 2006, claiming that she became disabled on November 25, 2004.[1] (Administrative Tr. at 145-47 [hereinafter R.].) Her initial application for benefits was denied on December 13, 2006. (Id. at 96-98.) After a Federal Reviewing Official confirmed the denial, (id. at 86-95, 100), Butler timely appealed to an administrative law judge ("ALJ"), and a hearing was held on August 6, 2008, (id. at 30). Testimony was heard from Butler, an independent medical expert, and a vocational expert. (Id.) After the hearing, the ALJ issued a written decision finding that Butler was not disabled. (Id. at 30-41.) The Decision Review Board affirmed the decision of the ALJ, and it became the final decision of the Commissioner. (Id. at 1-4.) Butler then filed a timely appeal on November 24, 2008, pursuant to 42 U.S.C. § 405(g).

---

[1] Butler amended the onset date of her disability to May 25, 2006 on June 10, 2008. (R. at 154.)

Before the Court are cross-motions to reverse, and alternatively to affirm, the decision of the Commissioner. Concluding that the administrative record substantially supports the ALJ's decision and that no error of law was made, the Court now affirms.

## I.  Factual Background

At the time she applied for benefits, Butler was fifty-two years old. (Id. at 24.) Her formal education is limited to completion of the eighth grade. (Id. at 53.) She last worked on May 25, 2006. (Id. at 46.) Her relevant past employment positions include packer and folder. (Id.) Butler is claiming disability due to anxiety, panic attacks, hypertension, and tendinitis in both arms.

### A.  Medical History: Physical

In March 1999, Butler was diagnosed with right lateral epicondylitis and right radial tunnel syndrome by Dr. Barry Simmons. (Id. at 407.) Pursuant to that diagnosis, Dr. Simmons performed surgery on Butler's right arm on May 4, 1999. (Id. at 390-91.) The record indicates that this surgery went well, and that Butler regained full function and range of motion with her right arm. (Id. at 228, 408-12.)

Several years later, on November 15, 2004, Butler reported a work-related injury to her left arm and was diagnosed with left lateral epicondylitis. (Id. at 236.) Butler was advised to avoid use of the left arm at work and attend physical therapy, which she did between November 2004 and mid-January 2005. (Id. 419-41.) At an appointment with Dr. Alan Rodgers on January 13, 2005, she reported that she had stopped physical therapy due to "failure to progress at even light activity." (Id. at 228.) Dr. Rodgers referred Butler to an orthopedic specialist. (Id.)

On April 4, 2005, Butler met with Dr. Marco Dirks, an orthopedic specialist. (Id. at 242.) Dr. Dirks noted that "[t]he patient reports persistent left elbow pain," and he prescribed medication.[2] (Id.) The doctor's notes from that initial visit indicate that Butler's employer had offered her an auditing job that avoided repetitive lifting, which Dr. Dirks noted would "be a good solution for the patient." (Id.)

Butler continued to meet with Dr. Dirks on a monthly basis with relatively little change in her symptoms between May and August 2005. (Id. at 244-51.) The record on July 25, 2005 indicates that Butler reported that she had "tolerated her modified duty," but that she was "eager to advance her activity." (Id. at 248.) In response, Dr. Dirks indicated that she could gradually advance her activity by dividing her time "working as an auditor for 4 hours a day and folding for 4 hours a day at 25% capacity." (Id.) The doctor's notes for an appointment dated August 29, 2005 indicate that Butler was "working harder than the prescribed restrictions." (Id. at 250.)

At an appointment on December 7, 2005, Dr. Dirks noted that Butler was tolerating her work status and that she reported modest improvement after a cortisone injection in November 2005. (Id. at 256.) Dr. Dirks started Butler on a steroidal Medrol Dosepak at this time, and suggested she continue with her then-current work status. (Id.) At a follow-up appointment the next month, Butler reported a fifty percent reduction in pain from the previous month. (Id. at 258.)

On February 15, 2006, Butler reported a recent exacerbation of her symptoms. (Id. at 260.) On exam, Dr. Dirks noted that the left elbow region appeared atraumatic with no overlying swelling or erythema, and that range of motion in the elbow revealed full extension, flexion, pronation, and supination without pain. (Id.) The notes indicate that neurovascular status was

---

[2] The prescribed medication was Relafen (nabumetone), a nonsteroidal anti-inflammatory drug. See PDR Generics 2243-45 (3rd ed. 1997).

intact, and that gross motor strength of all major muscle groups was normal. (Id.) Dr. Dirks discussed the possibility of surgery with Butler, but she declined to pursue it. (Id.)

In March 2006, Butler saw Dr. Dirks again. His notes indicate that Butler's "Family Medical Leave is ending," and that her employer had apparently advised her to either resume full-time work or accept total disability status. (Id. at 264.) On examination of her elbow, Dr. Dirks found that:

> [t]he range of motion reveals full extension, flexion, pronation, and supination without pain. Neurovascular status is intact with good distal sensation and pulses. There is tenderness both along the lateral epicondyle as well as along the radial tunnel. The pain is exacerbated with wrist extension and flexion as well as with pronation and supination. With Varus stress the joint is stable.

(Id.) Dr. Dirks thought that an "additional diagnosis of radial tunnel syndrome" was possible, and he discussed the treatment options of therapeutic cortisone or lidocaine injections. (Id.) Because of an upcoming sabbatical, Dr. Dirks referred Butler to a colleague, Dr. Steven Graff. (Id.) At that time, Butler apparently expressed a desire to work full-time, "working at 50% capacity." (Id.)

The record from Butler's appointment with Dr. Graff on April 27, 2006 indicates that she was working full duty. (Id. at 267.) Dr. Graff noted that he did not believe there was adequate clinical evidence to support a diagnosis of radial tunnel syndrome. (Id. At 266.) Dr. Graff further noted that he did not consider Butler a candidate for surgery, but suggested that she consult with Dr. Simmons, who had performed Butler's right arm surgery. (Id. at 267.) Dr. Graff recommended that Butler be released on permanent work restriction of eight hours a day at fifty percent productivity. (Id.)

On May 25, 2006, Butler met with Dr. Simmons for a surgery consult. (Id. at 302.) He noted that Butler "works quite hard, even beyond the limits that sometimes have been defined for her." (Id.) Dr. Simmons determined that it would be appropriate for Butler to have surgery on her left elbow, similar to the surgery he had previously performed on her right elbow in 1999. (Id.) The surgery was performed on June 12, 2006 by Dr. Simmons, consisting of a left lateral epicondylar release and debridement, and left radial tunnel release. (Id. at 298-99.) At a follow-up appointment on August 21, 2006, Butler showed improvement in sensory symptoms and range of motion. (Id. at 304.) Dr. Simmons noted at Butler's appointment the following month that her range of motion continued to improve, but suggested she discontinue physical therapy for ten days due to pain during resistance testing. (Id. at 305.)

Dr. Simmons's notes from an appointment on October 30, 2006 indicate Butler developed numbness and tingling in her left thumb, index and middle fingers, consistent with carpal tunnel syndrome. (Id. at 306.) An electromyography test and a nerve conduction test were negative for median neuropathy at the wrist (carpal tunnel syndrome). (Id. at 348-50.) Dr. Simmons then referred Butler to a neurologist for her continued numbness in the left digits. (Id. at 351.) The neurologist found that Butler "probably does have an entrapment of the median nerve," but concluded that he was "not sure that anything needs to be done." (Id. at 352.)

Pursuant to a November 7, 2006 request by the Social Security Administration, (id. at 307), the state agency consultant completed a physical residual functioning capacity assessment ("RFC") on November 27, 2006. (Id. at 313-20.) The state agency consultant found that Butler was capable of lifting and carrying up to twenty pounds occasionally, and lifting and carrying ten pounds frequently. It was also determined that Butler could stand, walk, and sit for six out of eight hours in a day, with normal breaks. (Id.)

5

Butler was seen on January 22, 2007, by Dr. Simmons jointly with Dr. Steven Mattheos. She reported a "new problem" of left shoulder and arm pain, which according to her report "came on gradually." (Id. at 353.) She denied any trauma to the area. The examination noted indicates that there was "clinical evidence of a rotator cuff tendinitis and biceps tenosynovitis." (Id.) She was given a prescription for rotator cuff stretching and strengthening. She repeated her desire to avoid surgery. (Id.)

At the suggestion of Dr. Simmons, Butler met with Dr. Zacharia Isaac, a physiatrist, in March 2007. (Id. at 356-57.) Dr. Isaac thought her shoulder pain could be due either to "tendinitis and/or tear" or to cervical radiculitis. (Id. at 357.) He suggested an MRI and a subacromial bursa injection followed by physical therapy. (Id.)

The physical therapist apparently refused to perform therapy on Butler's shoulder because the therapist thought that Butler needed a shoulder arthroscopy. (Id. at 370.) After an examination of Butler on June 28, 2007, Dr. Simmons decided to perform a left shoulder arthroscopy surgery. The surgery took place about a year later, the delay apparently due to insurance coverage issues. (Id. at 466-67.) Following the surgery, which occurred on June 10, 2008, Dr. Simmons indicated that Butler was disabled "for any employment at the present," and that she would be reevaluated in six weeks. (Id. at 470.)

Butler has also claimed to suffer from back pain which causes a tingling sensation and a shooting pain in her right leg that occasionally coincides with bowel incontinence. (Id. at 450.) In connection with these symptoms, Butler was seen by Dr. Grazyna Pomorska, a neurologist. (Id. at 450-60.) At three appointments between October 2007 and early January 2008, Dr. Pomorska noted that Butler had normal strength and sensation in the upper and lower extremities. (Id. at 453, 456, 459.) In January 2008, a neurosurgeon opined that Butler did not require surgery, nor

6

did the neurosurgeon believe Butler's episodes of incontinence were related to her back pain. (Id. at 458.) Butler declined to go to a pain clinic or undergo physical therapy in connection with her back pain. (Id. at 460.)

### B.     Medical History: Psychological

Butler had a consultative exam with Dr. Jean Boyd on November 9, 2006 for the purpose of generating a report for Disability Determination Services. (Id. at 308-11.) Butler stated in the course of that exam that she was aware of a nearly thirty-year history of anxiety and panic attacks, and that she was taking Xanax prescribed by her primary care physician to treat her anxiety. (Id. at 309.) Dr. Boyd found no evidence of hallucinations, delusions, paranoia, or of homicidal or suicidal ideation, and no evidence of obsessive compulsive disorder, or any checking behavior. (Id. at 311.)  Butler expressed sadness related to a recent loss, and noted that she avoided crowds because they made her uncomfortable. (Id.) Dr. Boyd assigned Butler a Global Assessment of Functioning ("GAF") score of 50. (Id.)

Butler was seen by counselor Mary Dionne at Stanley Street Treatment and Resources ("SSTAR"), a social services agency in Fall River, on October 1, 2007.  (Id. at 374.) Ms. Dionne observed that Butler was upset over losing her job. (Id.) Over the course of several appointments between October 16 and December 31, 2007, Ms. Dionne noted that Butler was anxious, but that her mood was stable. (Id. at 376-82.) Ms. Dionne also indicated that Butler was the "family caretaker." (Id. at 382.) Ms. Dionne referred Butler to Dr. Doug Griffiths, another clinician at SSTAR. (Id. at 379, 384.) Dr. Griffiths noted in appointments on January 18, March 19, and May 14, 2008 that Butler's panic attacks were helped by medication. (Id. at 384, 462, 464.) In a Supplemental Questionnaire as to Residual Functioning Capacity dated July 10, 2008, Ms. Dionne opined that Butler's psychological impairment did not rise above moderate in a range of

areas, including her ability to relate to other people, respond appropriately to supervision, respond to customary work pressures, and perform complex tasks. (Id. at 471-72.) In a narrative accompanying the questionnaire, Ms. Dionne stated that Butler "has been dealing with symptoms of depression, anxiety and panic most of her adult life," and went on to state that Butler "has, for the most part, been able to manage her symptoms and function well at both work and in her personal life." (Id. at 473.)

### C. ALJ's Findings

The ALJ found that Butler was not disabled within the meaning of the Social Security Act, (id. at 31), applying the five-step process required by 20 C.F.R. § 416.920. The ALJ found that Butler had not engaged in "substantial gainful activity" since the amended onset date of May 25, 2006, (id. at 32), and that Butler suffered from severe impairments in the form of status post left epicondylitis, degenerative disc disease of the lumbar spine, status post left shoulder labral repair and left rotator cuff impingement syndrome, and depression. (Id. at 33.) The ALJ also concluded that Butler's allegations of left carpal tunnel syndrome, hypertension, and anxiety as severe impairments were unsupported by the evidence, and that they represented a minimal impairment. (Id.) The ALJ then found that Butler does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id.) The ALJ found that Butler has the residual functioning capacity to perform less than the full range of light work as defined by the regulations. See § 404.1567(b). Specifically, the ALJ found that Butler could lift and carry up to ten pounds frequently and twenty pounds occasionally, and sit, stand, or walk for at least six hours in an eight-hour day, but only occasionally could she use her left arm for lifting and reaching, and she was limited to occasional climbing, crawling, crouching, stooping, kneeling, and balancing. With regard to

Butler's mental impairment, the ALJ found that Butler was capable of understanding, remembering, and carrying out simple one to three step tasks not involving independent judgment making through the course of an eight-hour day. (R. at 34.)

Although the ALJ found that Butler was precluded from performing past relevant work, the ALJ found that she could still perform other light and unskilled jobs in the national economy, such as counter attendant or order filler. (Id. at 39-40.) Based on these findings, the ALJ concluded that Butler was not disabled. In reaching this conclusion, the ALJ considered Butler's hearing testimony, the medical findings from Dr. Rodgers, Dr. Simmons, Dr. Walshe, Dr. Isaac, Dr. Pomorska, Dr. Boyd, Ms. Dionne, and the assessments from the state agency physicians, the vocational expert at the hearing, and Dr. Stephen Kaplan, who was the medical expert at the hearing.

## II.  Discussion

### A.  Standard of Review

The Social Security Act provides that factual findings of the Commissioner shall be conclusive if those findings are supported by "substantial evidence." 42 U.S.C. § 405(g). The First Circuit has held that the Commissioner's findings must be upheld "if a reasonable mind, reviewing the evidence in the record as a whole could accept it as adequate to support his conclusion." Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)). Further, the Commissioner's decision must be upheld "'even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence.'" Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 144 (1st Cir. 1987) (quoting Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987)). It is the Commissioner's responsibility

to determine issues of credibility, draw permissible inferences from the evidence, and resolve conflicts in the evidence. Irlanda Ortiz, 955 F.2d at 769. The determination of the ultimate question of disability is also for the Commissioner, rather than the doctors or the courts. Rodriguez, 647 F.2d at 222 (citing Alvarado v. Weinberger, 511 F.2d 1046, 1049 (1st Cir. 1975)).

    B.    Legal Analysis

Butler first argues that the ALJ's RFC determination, finding that Butler is capable of light exertional work, lacks substantial evidence. She alleges the ALJ erred in assigning significant probative weight to the opinion of the state agency consultant because the consultant was a non-examining source as defined by 20 C.F.R. § 404.1527, and because the consultant's findings did not reflect the body of evidence as a whole, as Butler underwent surgery on her shoulder eighteen months after the findings were completed. Butler also argues that more weight should have been given to Dr. Simmons's opinion that Butler was disabled for six weeks following the surgery on her shoulder,[3] and also to Dr. Kaplan's opinion at the hearing that Butler should avoid repetitive motion activities with her right arm.

The distinction between examining and non-examining sources is only one of several factors provided under the guidelines for the evaluation of medical opinions. § 404.1527(d). The ALJ will consider the medical opinions submitted in the record "together with the rest of the relevant evidence." § 404.1527(b). Under the regulations, it is the claimant's responsibility to provide evidence of impairment and its severity. § 404.1512(c). Butler provided no evidence that her shoulder surgery left her permanently disabled. It is clear from the record that the ALJ was

---

[3] The opinion Butler refers to is a handwritten note in the margin of a Physical Capacities Evaluation dated June 19, 2008. It reads, in full: "Pt disabled for any employment at the present. She will be re-evaluated in 6 wks." (R. at 470.) The hearing before the ALJ was held forty-eight days after the date of the Physical Capacities Evaluation. (Id. at 30, 470.)

aware of Butler's left shoulder surgery, since it was listed among the medical evidence considered in the ALJ's decision. (R. at 21.)

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or *can be expected to last for a continuous period of not less than 12 months.*" 42 U.S.C. § 423(d)(1)(A) (emphasis added). As the ALJ pointed out in the decision, Dr. Simmons's statement soon after the surgery does not indicate how long he believed Butler might remain disabled; he intended to review her case at six weeks post-surgery. (R. at 23.) His comment is therefore not adequate to meet the durational requirement. That the disability from surgery might last long enough to meet that requirement was thus left to be shown by other evidence, which was lacking.

The ALJ has the discretion to evaluate medical opinion evidence in terms of its consistency with the record as a whole. 20 C.F.R. § 404.1527(d)(5). Dr. Kaplan's testimony at the hearing regarding Butler's right arm was not consistent with record evidence that Butler's right arm problems were resolved by her 1999 surgery. (R. at 302.) Moreover, the relevant medical records focused primarily on issues concerning Butler's left arm, with little to no mention of the right arm after 1999. (Id. at 20-21.)

Butler also argues that the ALJ erred in rejecting Dr. Boyd's and Ms. Dionne's psychological evaluations. At the hearing stage, the ALJ is solely responsible for determining the claimant's RFC. § 404.1546(c). If evidence is inconsistent with other evidence in the record, or internally inconsistent, the ALJ has the responsibility of weighing and resolving that evidence. § 404.1527(b)(2); see also Rodriguez, 647 F.2d at 222. Dr. Boyd and Dr. Griffiths assessed Butler with a GAF score of 50 and 51 respectively. (R. at 311, 384.) These scores are consistent

with a serious impairment in social and occupational functioning. (Id. at 37.) The scores are summary, however, without detailed justification for the number assigned, and it was rationally possible for the ALJ to think the scores inconsistent with much of the evidence in the record. Ms. Dionne herself noted in a letter dated July 10, 2008, that Butler had dealt with psychological symptoms for most of her adult life and had been able to manage her symptoms and function well at work. (Id. at 473.) Ms. Dionne's notes consistently indicate that Butler's mood was stable at therapy sessions, (id. at 376-82), and Dr. Griffiths concluded that Butler was able to manage her panic attacks using medication, (id. at 464). In addition, as the ALJ points out in her opinion, Butler reported that she drove an automobile nearly every day, watched television, did light chores around the house, walked, handled her personal care independently, cared for pets, and occasionally did work on the computer. (Id. at 37-38.) Butler also reported that she considers herself the family caretaker, and was able to care for her parents and assist her brother in obtaining financial and emotional assistance from the Veterans' Administration. (Id. at 374-85.)

The ALJ's conclusion that Butler was not disabled from any work available in the national economy had a sufficient basis in the evidence available. There was no error to be corrected on this appeal.

### III.   Conclusion

For the foregoing reasons, the defendant's motion (dkt. no. 15) is GRANTED and the plaintiff's motion (dkt. no. 12) is DENIED. The Commissioner's decision is AFFIRMED.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge